UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY SEAY,

                Plaintiff,             Civil Action No.: 12-cv-14410
                                         Honorable George Caram Steeh
        v.                     Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.

_____/

### REPORT AND RECOMMENDATION
### ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 15]

Plaintiff Anthony Seay brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, [12, 15], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.      RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") committed reversible error at Steps Four and Five of the sequential analysis. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [15] be DENIED, Seay's motion [12] be GRANTED to the extent it seeks remand but DENIED to the extent it seeks outright reversal and an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be REVERSED AND REMANDED

for further consideration consistent with this Report and Recommendation.

## II.   REPORT

### A.   Procedural History

On October 5, 2010, Seay filed an application for DIB, alleging disability as of June 1, 2009.  (Tr. 156-57).  On October 14, 2010, he filed a claim for SSI, alleging the same onset date. (Tr. 158-63).  The claims were both denied initially on December 27, 2010.  (Tr. 83-113). Thereafter, Seay filed a timely request for an administrative hearing, which was held on July 13, 2011, before ALJ Miriam Fernandez Rice.  (Tr. 31-56).  Seay, represented by attorney Heidi Walcon, testified, as did vocational expert ("VE") Vanessa Harris.  (*Id.*).  On August 2, 2011, the ALJ found Seay not disabled.  (Tr. 8-23).  On August 7, 2012, the Appeals Council denied review.  (Tr. 1-7).  Seay filed for judicial review of the final decision on October 5, 2012.  [1].

### B.   Background

#### 1.   *Disability Reports*

Seay reported suffering from a number of conditions that prevent him from working, including diabetes, thyroid impairment, chronic pain, congestive heart failure, hypertension, cholesterol issues, and fatigue.  (Tr. 195).  Seay reported being six feet tall and weighing 305 pounds.  (*Id.*).  He stopped work as of the date of his alleged onset of disability in June 2010, but had made changes to his work activity in July 2009 due to his conditions.  (Tr. 195-96).  Seay reported being treated exclusively at the Veterans Administration Medical Center for his conditions and being prescribed myriad medications.  (Tr. 198-99; 207; 214; 216).

Seay reported that his day consists of playing on the computer, watching sports on television, reading books, and attending school two days a week for social work.  (Tr. 202).  He reported that he has pain and stiffness upon waking that resolves throughout the day and with

medication.  (*Id.*).  He also reported difficulty sleeping due to a need to frequent the bathroom.  (*Id.*).  He gets out of breath from walking long distances, and finds stairs difficult due to weak ankles and knees, as well as his weight, but has no trouble sitting or standing.  (*Id.*).  He reported trouble with lifting, squatting, bending and reaching due to his conditions.  (*Id.*).  Although he reported "a little problem" with his right hand due to a growth on an already scarred area, he is able to dress himself, shave, prepare simple meals, do housework, drive, shop, play on the computer and play dominoes.  (*Id.*).  He reported having trouble carrying groceries, however.  (*Id.*).  He also reported needing "extended periods of time to attempt to complete any small tasks."  (*Id.*; Tr. 208).

### 2.    *Plaintiff's Testimony*

Seay has an Associate Degree in Computer Aided Drafting and previously worked at a juvenile detention facility and in counseling.  (Tr. 35; 45).  He testified that he originally stopped working in June 2009 due to an injury sustained at work from restraining a resident.  (Tr. 35).  Shortly thereafter, he was diagnosed with prostate cancer.  (*Id.*).  He underwent surgery in December 2009, but due to complications his surgery could not be completed.  (*Id.*).  Prior to this, in October 2009, he had begun working at a new job.  (Tr. 36).  From February to April 2010, Seay underwent radiation treatment for his cancer.  (*Id.*).  He had to leave work daily for treatment, and testified that on some days he was unable to return to work because the treatment made him ill.  (*Id.*).  On other days, he did not go to work at all due to the effects of the treatment.  (*Id.*).  When he worked full days, his day consisted of five to seven hours of work.  (*Id.*).  He was terminated from that job in June 2010 due to a dispute with his boss, which he attributed to his constant need to take time off for treatment.  (Tr. 44).

Seay testified that he also had undergone thyroid surgery for which he still takes

3

medication. (Tr. 37). He testified that occasionally his neck will swell up despite the surgery. (*Id.*). He further testified to weight fluctuation, between 270 and 315 pounds. (*Id.*). He testified to being diagnosed with congestive heart failure which contributes to breathing problems upon exertion. (Tr. 37-38). He also experiences fatigue and testified to lying down "for the last six or seven months." (Tr. 38). He testified to having arthritis and pain in his left shoulder and hip, as well as both knees. (Tr. 39). He also had a growth removed from his right hand that has since grown back, which causes him pain and makes writing, buttoning, and zipping difficult. (Tr. 39-40). Seay testified that he takes five medications for his heart, in addition to another five medications for his other conditions. (Tr. 38). His medications cause a number of side effects, including nausea, chills, depression and difficulty focusing. (Tr. 42-43).

Seay testified that he is able to lift a gallon of milk "a couple of times" with his right hand, can stand in one spot for 25 minutes to a half an hour and can walk a couple of blocks and two flights of stairs before needing to rest. (Tr. 40-41). He had trouble sitting prior to his prostate surgery due to a need to frequent the bathroom, but has since been cleared of prostate cancer following his treatment. (Tr. 44-45). He testified that he is able to fix his own meals, shop for groceries, (although he needs help carrying them), and drive. (Tr. 47).

### 3. *Medical Evidence*

#### a. *Treating Sources*

Seay has been diagnosed with a number of conditions over the years. Because he does not challenge the ALJ's Step Two assessment of his severe conditions, the Court will only discuss the medical evidence as it relates to those conditions found severe by the ALJ.

##### i. *Prostate Cancer*

According to the treatment records, Seay was diagnosed with prostate cancer in July

4

2009, following an elevated prostate specific antigen level in May 2009 and a prostate biopsy and ultrasound in July 2009.  (Tr. 231; 233; 311-13).  Seay underwent a radical retropubic prostatectomy on December 14, 2009, but when it was determined that his prostate was too far posterior to the pelvic brim for a proper dissection, the procedure was aborted and a simple pelvic lymphadenectomy was performed.  (Tr. 227-28; 235; 302-307).  Seay then underwent radiation treatment from February 2 to April 7, 2010.  (Tr. 280-302).[1]  The treatment notes indicate that Seay felt "good," had "no complaints" about his treatment, that he continued to have a "good energy level" after treatment, and that he "tolerate[d] radiation very well."  (*Id.*).  Treatment notes from 2010 and 2011 follow-up appointments after Seay's completion of radiation therapy showed no recurrence of his cancer.  (Tr. 225-227; 242-43; 276-77; 336-38).

### ii.     *Thyroid Disorder*

Seay underwent a subtotal thyroidectomy on March 26, 2007, for a multimodal goiter. (Tr. 238-39).  In November 2008, Seay was diagnosed with a malignant neoplasm of his thyroid gland following a nasopharyngoscopy.  (Tr. 234).  Despite its malignant status, it appears that it remained untreated, at least as reflected in treatment notes of June 2009 where the diagnosis was again made.  (Tr. 232-233).  Other treatment notes merely reflect a diagnosis of post-surgical hypothyroidism and the presence of a non-toxic goiter in January 2010, neither of which appear to have received any sort of aggressive treatment  (Tr. 223; 226; 233).

### iii.    *Diabetes*

Seay's medical records regarding his diabetes generally reflect only a diagnosis and continuation of medications, most often as part of a general examination or an examination for

---

[1] While Seay testified that his radiation treatment was daily, the treatment notes only reflect one treatment a week, and some of the treatment notes make it appear that he only went once a week for treatment.  (Tr. 280-302) (*e.g.* Tr. 298; Seay "indicated last week he noticed some blood… this has since resolved").

another condition.  (Tr. 226-227; 233-34; 241).  Treatment notes from a heart examination in July 2008 noted that his diabetes was "well controlled."  (Tr. 241).  A diabetic foot test conducted on July 19, 2010, returned normal results.  (Tr. 223; 252; 254-55).  Seay's diabetes was considered controlled and his medications were continued.  (Tr. 258).  Treatment notes from June 2009 and June 2010 ophthalmological visits documented suspected unspecified pre-glaucoma, as well as senile cataracts, but do not specifically relate those conditions to Seay's diabetes.  (Tr. 232-33; 224; 269-76).  Indeed, the treatment note from the 2009 visit specifically documented his diabetes as being "without retinopathy."  (Tr. 275).

### iv.   Congestive Heart Failure

Seay underwent an electrocardiogram on May 9, 2008, but the results of this test were not found in the record.  (Tr. 308).  On July 31 of that year, Seay underwent a heart exam.  (Tr. 239-41).  He reported having been diagnosed with congestive heart failure ten years prior.  (Tr. 240).  The treatment notes indicate abnormal results from an echocardiogram and after an examination and testing the doctor diagnosed Seay with dilated cardiomyopathy with chronic congestive heart failure.  (Tr. 239-41).  At the time, Seay's LV workload was 4 METS and his ejection fraction was 26%.  (Tr. 241).  Treatment notes from primary care visits between December 10, 2008, and January 4, 2010, indicate only a continued diagnosis of congestive heart failure but do not reflect any specific treatment for this condition.  (Tr. 226; 229-30; 233-34).  Another electrocardiogram was conducted on November 25, 2009, but again the results are not located in the record.  (Tr. 228; 307).  An x-ray taken of Seay's chest that same day revealed "[n]o evidence of acute congestive heart failure."  (Tr. 309-310).  Treatment notes from a visit on July 19, 2010, show that Seay's congestive heart failure was "stable" and his medications were refilled.  (Tr. 223; 252).

*v.      Obesity*

There is little evidence in the record directly relating to Seay's obesity as a condition. On June 17, 2010, there is a treatment note documenting a nutrition "follow-up." (Tr. 224). At an exam on July 19, 2010, Seay was praised for his weight loss and was recommended to continue with diet and exercise. (Tr. 252). Treatment notes from a primary physician appointment on January 4, 2010 (for a flu shot) document a diagnosis of obesity, but nothing more. (Tr. 226).

*vi.      Bony Deformity on Hand*

Seay presented to his doctor on November 27, 2010, with "numerous concerns," one of which was right hand swelling at the site of where he reported having had surgery four years prior. (Tr. 338). Seay reported pain when pressure was applied to the hand. (*Id.*). Upon exam, the doctor noted swelling and a "possible lump" measuring one centimeter in diameter. (Tr. 340). He referred Seay for an x-ray. (*Id.*). That x-ray documented "two bone densities projecting over and adjacent to the midshaft of the right fifth metacarpal," but noted that the reviewer was unsure, due to the lack of prior film, whether the changes "represent postsurgical, posttraumatic or congenital changes." (Tr. 345). It also noted that "[n]o acute findings are evident." (*Id.*). Seay was referred to a hand and plastics specialist on April 25, 2011, complaining of a recurrent growth on his right hand that causes him pain "every now and then." (Tr. 333). He reported previous removal of a mass at that location in 2004. (Tr. 333). Upon examination, the doctor noted an "[i]rregular, firm, bony growth primarily over dorsum of fourth metacarpal." (Tr. 335). However, Seay was found to have a good range of motion and good grip strength despite this deformity. (*Id.*). The doctor referred Seay for an MRI, the results of which were not found in the record. (Tr. 335-36).

7

### vii.    Chronic Pain

In May 2009, Seay was evaluated for lower back pain and prescribed self-management education and training.  (Tr. 233).  In June 2009, Seay presented with left hip pain, which was diagnosed in July of that year as bursitis and the site was either drained, injected with medicine, or both.  (Tr. 231).  A hip x-ray taken on June 23, 2009, was unremarkable.  (Tr. 313).  Seay later complained of pain in his left groin and a CT scan of his pelvis in July 2009, taken to rule out a groin hematoma, revealed no hematoma.  (Tr. 311).  Seay was evaluated again for his hip bursitis on September 15, 2009.  (Tr. 230).  Seay presented again with pain in his pelvis and thigh on December 22, 2009, but his encounter was brief and no doctor was seen.  (Tr. 227).  On January 6, 2010, Seay underwent x-rays of his left hip and pelvis.  (Tr. 308-309).  His hip x-ray revealed "[n]o acute osseous or articular abnormalities," while the x-ray of his pelvis found "moderate degenerative changes . . . in the left hip greater than the right hip."  (*Id.*).  Seay's hip bursa was drained and or injected again on January 6, 2010.  (Tr. 226; 230).

On July 20, 2009, Seay was also evaluated for some unspecified "pain in limb."  (Tr. 231).  On October 2, 2009, Seay presented with shoulder pain and underwent an x-ray on his left shoulder which revealed "[m]ild degenerative changes at acromiclavicular joint" and "[p]ossible changes of bursitis at the bicepital groove."  (Tr. 310-11).  He was diagnosed with osteoarthrosis and degenerative joint disease.  (Tr. 229).  On October 9, 2009, Seay's left shoulder bursa sac was either drained or injected or both.  (Tr. 229).

On November 17, 2010, Seay presented with "numerous concerns," one of which was pain in his neck and right shoulder secondary to moving furniture.  (Tr. 338-39).  He underwent x-rays on his right shoulder and cervical spine.  (Tr. 346-47).  His right shoulder x-ray was negative, and his cervical x-ray showed "[n]o evidence of compression fracture or subluxation."

(*Id.*).  The doctor continued his pain medication.  (Tr. 340).  On July 19, 2010, Seay presented for a general medical exam and refills.  (Tr. 250-60).  His pain medications were continued.  (Tr. 252).

### viii.    *Chronic Obstructive Pulmonary Disorder*

While the ALJ found that Seay had the severe impairment of Chronic Obstructive Pulmonary Disorder ("COPD"), a review of the record found no diagnosis of COPD, and notations where COPD was specifically ruled out.  (E.g., Tr. 47).  There is a notation at the beginning of Seay's records, where all past diagnoses are collected, which reflects a previous diagnosis of shortness of breath and also one of chronic airway obstruction, but neither was diagnosed within the timeframe encompassed by the records in the file (both reflect dates in 2005), and there is no indication whether either diagnosis is relevant to or symptomatic of COPD.  (Tr. 221).  The only other notation in the record that could be relevant to this finding is a notation on a chest x-ray taken on November 25, 2009, that "[m]inimal atelectatic changes [were] seen in the right lower lung field."  (Tr. 310).

### b.    *Consultative and Non-Examining Sources*

Seay underwent a consultative physical examination on December 9, 2010.  (Tr. 324-26). He reported being diagnosed with congestive heart failure but that he had no history of chest pain, myocardial infarction or stroke.  (Tr. 324).  He also reported a diagnosis of diabetes with some leg swelling and proteinuria but that he had never been hospitalized for diabetic ketoacidosis or diagnosed with renal disease.  (*Id.*).  He reported not being on a diet, loving to eat, and drinking mostly punch.  (*Id.*).  He does not exercise.  (*Id.*).  He reported a history of prostate cancer with no recurrence, prior thyroid surgery, and prior hand surgery in 2007.  (*Id.*). He has pain in his hand and neck.  (*Id.*).  He reported being on several medications for his

conditions and occasionally forgetting to take them.  (*Id.*).  After an unremarkable exam, the doctor found that Seay suffered from hypertension, congestive heart failure, diabetes, hypothyroidism secondary to thyroidectomy, a history of prostate cancer and to rule out fracture of right hand.  (Tr. 325-26).  His medical source statement noted that Seay's blood pressure was "well controlled" although he still had symptoms of congestive heart failure.  (Tr. 326).  The doctor noted "no heart murmur, gallop, pulmonary rales, visceromegaly, or leg edema."  (*Id.*).  He also noted that Seay's blood sugar was okay and his medication was continued and there had been no diabetic complications.  (*Id.*).  He further noted that despite the bony growth on Seay's right hand, "[t]he wrist and fingers have no inflammation and have full range of movement.  He can finger to finger and pick up small things."  (*Id.*).

### 4.     Vocational Expert's Testimony

VE Harris testified that Seay's past work as a merchandise deliverer was medium and unskilled, his work as a corrections officer was medium and semi-skilled and his work as a social service aide was light and skilled, but performed at the sedentary level.  (Tr. 50-51).  The ALJ then asked the VE to imagine a hypothetical claimant of Seay's age, education level, and vocational background, who could work at the light level with the following limitations:

> only occasionally climb ramps, stairs; never climb ladders, ropes or scaffolds; frequent balancing; occasional stooping, crouching, kneeling[,] crawling.  Avoid concentrated exposure to environmental irritants such as fumes, odors, dusts and gasses.  Avoid concentrated exposure to moving machinery or unprotected heights.

(Tr. 51).  The ALJ then asked the VE if such an individual could perform any of Seay's past work.  (*Id.*).  The VE testified that such an individual could perform the position of social service aid.  (*Id.*).  The ALJ then added a limitation of "no constant fingering of objects with the right hand."  (*Id.*).  The VE testified that the social service aide position could still be performed with

such a limitation.  (*Id.*).  The ALJ then asked if there were any transferrable skills from Seay's past work to other work at the light or sedentary levels.  (*Id.*).  The VE identified skills including record keeping, scheduling activities, and report writing.  (Tr. 52).  The ALJ then asked if there were other jobs in the national economy that would utilize those transferrable skills, given the limitations previously imposed.  (*Id.*).  The VE identified three sedentary semi-skilled positions: receptionist (the number of jobs was not transcribed in the record due to an inaudible recording), scheduler (1,500 regional positions) and credit card clerk (1,000 regional positions).  (*Id.*).

In response to questioning from Seay's counsel, the VE testified that the positions identified would require "no more than frequent" fingering during the day and that if a claimant could only use his right hand for one-third of the day, those positions would be eliminated.  (Tr. 52-53).  The VE also testified that a need to be off-task up to one-third of the day due to medication side effects would preclude work.  (Tr. 53).

### C.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

11

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comer of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Hesston v. Comer of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Presale v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

Following the five-step sequential analysis, the ALJ concluded that Seay was not disabled.  At Step One, she found that although Seay worked after his alleged onset date, it was classified as an unsuccessful work attempt, due to his inability to complete his job and his frequent absences for treatment for his conditions.  (Tr. 13).  At Step Two the ALJ identified the following severe impairments: "Type 2 diabetes mellitus; thyroid impairment; chronic pain; status-post thyroid removal; congestive heart failure; status-post prostate cancer; chronic obstructive pulmonary disease (COPD); status-post surgery for bony growth at fourth metacarpal right hand."  (*Id.*).  At Step Three, the ALJ found that none of Seay's impairments, either alone

12

or in combination, met or medically equaled a listed impairment, giving specific consideration to

Listing 9.08 for Seay's diabetes, Listing 4.02 for his congestive heart failure and Listing 3.02 for

his COPD.  (Tr. 14-15).

The ALJ then assessed Seay's residual functional capacity ("RFC"), finding him capable

of

> Light work . . . except: he can occasionally climb ramps and stairs, but can
> never climb ladders, ropes or scaffolds; frequently balance and
> occasionally stoop, c[r]ouch, kneel and crawl.  He has to avoid
> concentrated exposure to environmental irritants such as fumes, odors,
> dusts and gases; avoid concentrated exposure to moving machinery and
> unprotected heights.  Additionally, this individual could do no constant
> fingering of objects with his right hand, that is, fine manipulations of items
> no smaller than the size of a paper clip.

(Tr. 15).  At Step Four, the ALJ found that Seay, with the RFC assessed above, was capable of

returning to his past work as a social service aide.  (Tr. 18).  Although this concluded the ALJ's

analysis, she alternatively found that, based on his age, education, vocational background, skill

level and RFC, Seay could perform a significant number of other positions available in the

national economy, including scheduler, receptionist, and credit card clerk.  (Tr. 19).  Therefore,

the ALJ concluded, Seay was not disabled under the Act.  (Tr. 20).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative

decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the

Court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d

591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not

remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations

14

omitted).

###### F.    Analysis

Seay argues that the ALJ erred in concluding that he was not disabled.  First, he argues that the ALJ improperly assessed his credibility.  Second, he argues that the ALJ erred at Step Four in finding that his prior unsuccessful work attempt as a social service aide constituted "past relevant work" to which he could return.  Finally, he argues that because his work as a social service aide was not past relevant work, it could not have generated any of the transferrable skills used by the VE to identify other jobs in the national economy that Seay could still perform, rendering erroneous the ALJ's alternative Step Five finding.  The Court addresses these arguments in turn.

###### 1.    Seay's Credibility

First, Seay argues that the ALJ erred in her assessment of his credibility.  The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to his credibility.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Thus an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible.  *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

15

Seay argues that the ALJ improperly discounted his credibility and the severity of his conditions when she found that his treatment had been mostly routine and conservative in nature. He points out that prostate cancer surgery and radiation treatment, and his prior surgery for the bony growth on his hand are neither routine nor conservative treatments.  He further argues that his dilated cardiomyopathy with chronic congestive heart failure "would not be considered routine."  (Plf. Brf. at 8).  With regard to Seay's prostate cancer, while that condition and its subsequent treatment are certainly not considered routine or conservative, the Commissioner rightly notes that Seay only suffered from that condition from July 2009 to April 2010, less than the 12 month required to meet the duration requirement under the Act.  20 C.F.R. § 404.1509. As the treatment notes reflect, Seay had no recurrence of his cancer and no complaints of complications after the completion of radiation treatment.  With regard to the surgery on the bony growth on his hand, according to Seay's subjective reports that surgery took place sometime between 2004 and 2007, (Tr. 324; 333; 338), but in any event at least two years before his alleged onset date, and the treatment notes reflecting the recurrence of this growth noted that Seay only complained of the pain "now and then" and that he still maintained a good range of motion and a good grip strength in the hand.  (Tr. 335-36).  Furthermore, despite no doctor assessing any limitations based on this condition, the ALJ gave some weight to Seay's subjective complaints, finding him restricted from constant fingering with his right hand.  (Tr. 15; 17-18). Finally, with regard to Seay's congestive heart failure, the ALJ appropriately characterized the treatment records, which reflect nothing more than conservative or routine treatment of the condition, for example, with medication.  (Tr. 16; *see supra* Section 3(a)(iv)).

In sum, the ALJ properly assessed Seay's credibility, and substantial evidence supports her conclusion that Seay's subjective complaints were less than fully credible.  (Tr. 17-18).

2.      *The ALJ's Step Four Finding*

Seay next argues that the ALJ erred in finding at Step Four that he could return to his past

relevant work as a social service aide because that work did not last long enough to constitute

past relevant work under the Act.  The Court agrees.  For purposes of a Step Four analysis, past

relevant work must be work that was (a) done within the last 15 years; (b) lasted long enough for

the claimant to learn to do it; and (c) was substantial gainful activity.  20 C.F.R. § 404.1565(a).

Substantial gainful activity is defined as work "that involves doing significant physical or mental

activities . . . even if it is done on a part-time basis or if you do less, get paid less, or have less

responsibility than when you worked before."  20 C.F.R. §§ 404.1572(a)-(b), 416.972(a)-(b).

However, work classified as an unsuccessful work attempt – i.e., "work that a claimant is forced

to stop after a short time because of his or her impairment," *Banks v. Barnhart*, No. 01-382, 2002

U.S. Dist. LEXIS 12788 (N.D. Ill. July 15, 2002) – is not substantial gainful activity constituting

past relevant work.  *Id. citing Sample v. Shalala*, 999 F.2d 1138, 1142 (7th Cir. 1993); *see also*

20 C.F.R. § 404.1574(a)(1) ("Your earnings from an unsuccessful work attempt will not show

that you are able to do substantial gainful activity.").

Here, at Step One, the ALJ found that Seay's work as a social service aide constituted an

unsuccessful work attempt, finding that although Seay "had earnings after the alleged onset

date," since his "work ended due to his impairments and frequent absences, it is considered an

unsuccessful work attempt."  (Tr. 13).[2]  However, at Step Four she proceeded to classify this

---

[2] The Court notes that the ALJ gave Seay "the benefit of the doubt" in this respect.  (Tr. 13).
That conclusion was based, at least in part, on what appears to be an erroneous factual premise
that Seay's work ended in April 2010, instead of June 2010 as he testified at the hearing, (*see
id.*).  However, without more information in the record to determine what led the ALJ to ascribe
the date of April 2010 as the terminus date of Seay's work, the Court cannot say that conclusion
was error as a matter of law.  *Hyatt Corp v. NLRB*, 939 F.2d 361, 367 (6th Cir. 1991) ("Courts
are not at liberty to speculate on the basis of an administrative agency's order. . . .").  Moreover,

same work as "past relevant work" finding that it met the "recency, duration, and substantial gainful activity requirements to qualify . . . ." (Tr. 18). This finding is error. As noted above, a work attempt that at Step One is classified as unsuccessful cannot be considered at Step Four to be past relevant work. *See Stephens v. Barnhart*, 50 Fed. Appx. 7, 9 (1st Cir. 2002) (where ALJ finds at Step One that work did not meet substantial gainful activity standard, could not constitute past relevant work at Step Four); *Gaudino v. Astrue*, No. 10-6656, 2012 U.S. Dist. LEXIS 13549, *32-33 (W.D.N.Y. Feb. 3, 2012) (same); *Johnson v. Astrue*, No. 11-927, 2012 U.S. Dist. LEXIS 131314, *39-40 (E.D. Mo. Sept. 14, 2012) (Appeals Council acknowledged that work not performed at substantial gainful activity level could not be past relevant work). Therefore, the ALJ erred at Step Four when she classified Seay's unsuccessful work attempt as a social service aide as "past relevant work" and concluded he could return to that position. (Tr. 18-19) ("the [VE] testified that … [Seay] could perform his past relevant work as a social service aid[e]…[and that Seay] would not be able to perform the merchandise deliverer and [] corrections officer jobs as per the D.O.T…").

> 3.    *The ALJ's Alternative Step Five Finding*

Although the ALJ concluded that Seay's ability to return to his past work rendered him not disabled, she went on to make an alternate finding at Step Five. (Tr. 19). If the ALJ's alternative Step Five finding is legally sufficient and based on substantial evidence, any error she committed at Step Four would be considered harmless. *Roberts v. Astrue*, 09-1581, 2010 U.S. Dist. LEXIS 111663, *37-38 (E.D. Cal. Oct. 4, 2010). Here, the ALJ found, based on VE

---

the Commissioner has not argued this issue. Therefore, the Court must analyze the validity of the ALJ's decision in light of her Step 1 finding. *See Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) (noting that "[a] court is under no obligation to scour the record for errors not identified" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived") (citations omitted).

testimony that Seay had acquired transferrable skills from his past work – namely record keeping, scheduling activities and report writing – that there were a significant number of other positions in the national economy that he could perform, including receptionist, scheduler, and credit card clerk.  (Tr. 19).[3]  Seay argues that this alternative finding was also error, because it was based on the application of transferrable skills from work that could not be classified as past relevant work.  Again, the Court agrees.

Just as an unsuccessful work attempt cannot be considered past relevant work at Step Four, it also cannot be used to generate transferrable skills that could be applied to other work in the national economy at Step Five.  *Moore v. Astrue*, 08-020, 2009 U.S. Dist. LEXIS 50588, *18 (N.D. Tex. March 10, 2009) (holding that an unsuccessful work attempt "generally does not qualify as past relevant work for purposes of determining transferable skills"); *Rikard v. Astrue*, No. 07-162, 2009 U.S. Dist. LEXIS 22160, *9 (N.D. Miss. Mar. 18, 2009) (where substantial evidence did not support prior work as past relevant work due to duration, there did not exist substantial evidence to support existence of transferrable skills from such work); *Roberts v. Astrue*, 09-1581, 2010 U.S. Dist. LEXIS 111663, *37-38 (E.D. Cal. Oct. 4, 2010) (holding where ALJ failed to make finding regarding past relevant work, could not then rely on such work to generate transferrable skills for use at Step Five).  Here, the ALJ relied on VE testimony to conclude that there were other positions in the national economy that Seay could perform.  However, the VE's testimony appears to have been based, at least in part, on the erroneous assumption that Seay's work as a social service aide constituted past relevant work and thus could generate transferrable skills.

The Commissioner argues that the record is not clear whether the skills identified by the

---

[3] The VE testified that these jobs "utilize those transferable skills."  (Tr. 52).

VE were the product of Seay's unsuccessful work attempt as a social service aide, or based upon his much longer position as a corrections officer.  She points to the Dictionary of Occupational Titles ("DOT") listing for corrections officer, which lists a number of acquired skills including report writing.  It is true that report writing is one of the skills listed under that entry, (D.O.T. # 372.667-018), however, neither of the other two skills the VE identified as being transferrable (and utilized in the proposed jobs) (Tr. 52) is listed under that entry.  (*Id.*).  Furthermore, none of the skills identified by the VE is specifically listed in the entry for social service aide, (D.O.T. # 195.367-034).

Therefore, from the record before it, the Court is unable to determine which position the VE was drawing from in assessing transferrable skills.  The ALJ's error at Step Four, coupled with the lack of clarity in the record as to the origin of the transferrable skills leads this Court to find that the ALJ's decision is not adequately reviewable on this record.  *Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1226 (9th Cir. 2009) (Reversing affirmance of ALJ decision where "district court chose to review the transferrable skills finding based on what it assumed the ALJ to have determined, but meaningful review of an administrative decision requires access to the facts and reasons supporting that decision.").

Because it appears that the ALJ relied on flawed VE testimony to the extent it was based on the assumption that Seay had transferrable skills from work that the ALJ herself deemed to be an unsuccessful work attempt, her Step Five conclusion that Seay could perform a number of semi-skilled positions in the national economy is not supported by substantial evidence.  The decision should therefore be reversed for the limited purpose of considering what, if any, transferrable skills Seay acquired from his past relevant work (to which the ALJ already concluded he could not return, based on his RFC), and to what extent those skills could be

transferred to other work available in the national economy. Further, to the extent Seay possesses no transferrable skills applicable to his RFC – an issue on which this Court expresses no opinion – the ALJ should inquire whether unskilled work exists in the national economy for a hypothetical claimant of Seay's age, educational level, vocational background and RFC.[4]

## III.    CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Seay's Motion for Summary Judgment **[12]** be **GRANTED** to the extent it seeks remand but **DENIED** to the extent it seeks outright reversal and an award of benefits, the Commissioner's Motion **[15]** be **DENIED** and this case be **REVERSED AND REMANDED** for further consideration consistent with this Report and Recommendation.

Dated: September 17, 2013                    s/David R. Grand_____
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as

---

[4] Seay does not argue for remand, but instead argues for an outright reversal and award of benefits. However, there is precedent for a court to *sua sponte* remand a case back to the ALJ under sentence four of 42 U.S.C. § 405(g). *See Martin v. Comm'r of Soc. Sec.*, 61 Fed. Appx. 191 (Moore J., dissenting) (quoting *Iognia v. Califano*, 568 F.2d 1383, 1387 (D.C. Cir. 1977)) (noting that a court has the authority to remand a case under sentence four *sua sponte*); *Wenzlick v. Astrue*, No. 08-12414, 2009 U.S. Dist. LEXIS 77154 at *4-5 (E.D. Mich. Aug. 28,. 2009) (noting in *dicta* magistrate's *sua sponte* remand appropriate, though deciding the case on other grounds); *Lebron v. Barnhart*, 2007 U.S. Dist. LEXIS 33410 at *18-19 (S.D.N.Y. Apr. 26, 2007). This is because a district court reviewing an ALJ's decision on disability is "performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2nd. Cir. 1981). Furthermore, the Sixth Circuit has held that "only when 'all essentially factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits' should a court reverse an ALJ's decision and immediately award benefits." *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994) *quoting Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 175 (6th Cir. 1994). Otherwise, the proper course is to remand the case back to the ALJ. *Id.*.

provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 17, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager